87 P.3d 81

James F. BURKE and Margaret A. Burke, husband and wife, Plaintiffs–Appellants Cross Appellees,

v.

VOICESTREAM WIRELESS CORPORA-TION II, a Washington corporation; Voicestream PCS III, a Delaware corporation; Scottsdale Worship Center, Defendants–Appellees, Cross Appellants.

No. 1 CA–CV 02–0031.

Court of Appeals of Arizona, Division 1, Department B.

March 30, 2004.

Cheifetz & Iannitelli, P.C. By Claudio E. Iannitelli, Antonino Abate, Phoenix, Attorneys for Appellants/Cross Appellees.

Snell & Wilmer, L.L.P. By David E. Rauch, Martha E. Gibbs, Phoenix, Attorneys for Appellee/Cross Appellant Voicestream.

Simbro White & Barfield, P.C. By Stephen B. White, Scottsdale, Attorneys for Appellee/Cross Appellant Scottsdale Worship Center.

## OPINION

GEMMILL, Judge.

¶ 1 The trial court ruled that the deed restrictions for a residential subdivision did not prohibit the construction and continuing presence of a cellular telephone signal transmission tower on church premises within the subdivision. We reverse. The deed restrictions apply to the tower and are enforceable by appellants James F. and Margaret A. Burke.

## BACKGROUND

¶ 2 In 1992, the Burkes purchased the home located on Lot 22 of Desert Estates Unit 4 ("Desert Estates"), a residential subdivision in Scottsdale. The subdivision is subject to a Declaration of Restrictions ("Restrictions").

¶ 3 At the time of the Burkes' purchase, the Scottsdale Worship Center ("SWC") operated on Lots 18 and 19 of the subdivision. In 1995, SWC purchased Lot 17, which is adjacent to the back of the Burkes' lot. SWC built a new sanctuary on Lot 17 in 1996. The Burkes objected to the lighting on Lot 17, and SWC adjusted the lighting.

¶ 4 In September 1999, SWC entered into an agreement with Voicestream[1] to lease a portion of Lot 17 for a fifty-foot high cellular telephone signal transmission tower decorated as a bell tower with four crosses and three hanging bells. The Burkes learned about the planned tower in October 1999 and sent a letter dated November 5, 1999 to SWC objecting to the tower.

¶ 5 In response to neighborhood opposition to the tower, SWC notified Voicestream in writing that it wished to rescind the lease agreement for the tower. Voicestream threatened to sue SWC if it did not honor the agreement and informed SWC that it would seek more than $100,000 that Voicestream claimed it had already spent on the tower project. SWC agreed to honor the lease and allow the tower construction.

¶ 6 The Burkes had previously been informed that SWC had acted to rescind the lease. They claim that neither they nor any of their neighbors were advised that the tower project would continue. SWC, however, claims that the Burkes and other neighbors were told that the tower project would continue.

¶ 7 Voicestream began actual construction of the tower on June 16, 2000. The Burkes filed this action on June 23, 2000, alleging that Voicestream and SWC were breaching the Restrictions by erecting the tower and seeking a temporary restraining order to stop construction. The trial court declined to issue a temporary restraining order because, by the time of the hearing on June 27, 2000, the tower structure was already substantially completed.

¶ 8 The parties filed cross-motions for summary judgment. The trial court denied the Burkes' motion and granted Voicestream's and SWC's motion after finding that section 4 of the Restrictions was ambiguous as to whether the "structure" restriction was limited to habitable structures and resolved the ambiguity in favor of the free use of SWC's property. The court further found that there was undisputed evidence that section 4 had been violated on numerous occa-

sions and that under those circumstances section 4 had been abandoned or waived. The court determined that the non-waiver provision of the Restrictions could not be applied to selectively enforce section 4 against Voicestream and SWC because other non-residential structures had been erected without challenge. The Burkes were precluded, according to the trial court, from obtaining equitable relief because they had not filed their action until the tower was substantially complete, removal of the tower would cause a loss to Voicestream of approximately $300,000, and the harm resulting from enforcement of section 4 would be disproportionate to the potential damages suffered by the Burkes.

¶ 9 The trial court entered judgment in favor of Voicestream and SWC but declined to award them attorneys' fees. The Burkes appeal from the judgment, and Voicestream and SWC cross-appeal from the denial of their applications for awards of attorneys' fees.

## ANALYSIS

### Interpretation of Section 4 of the Restrictions

¶ 10 The Burkes argue that the trial court erred as a matter of law when it found that section 4 of the Restrictions was ambiguous and should be interpreted to apply only to habitable structures.

¶ 11 Restrictive covenants in deeds "constitute a contract between the subdivision's property owners as a whole and individual lot owners." *Ahwatukee Custom Estates Mgmt. Ass'n, Inc. v. Turner*, 196 Ariz. 631, 634, ¶ 5, 2 P.3d 1276, 1279 (App.2000). The interpretation of a contract is generally a matter of law, and we are not bound by the trial court's conclusions of law. *Scholten v. Blackhawk Partners*, 184 Ariz. 326, 328, 909 P.2d 393, 395 (App.1995). Likewise, whether a contract is ambiguous is a question of law that we review *de novo*. *Hartford v. Indus.*

---

1. Appellees Voicestream Wireless Corporation II and Voicestream PCS III are referred to as "Voi-   cestream" in this opinion.

*Comm'n,* 178 Ariz. 106, 111, 870 P.2d 1202, 1207 (App.1994).

¶ 12 Section 4 of the Restrictions provides as follows:

No structure shall be erected, altered, placed or permitted to remain on any of said lots other than one detached single-family dwelling not to exceed one story in height and a private garage not to exceed one story in height for not more than Three (3) cars, and a guest or servant quarters for the sole use of actual non-paying guests or actual servants of the occupants of the main residential building.

The Burkes argue that the phrase "no structure" is intended to prevent structures such as the fifty-foot tower from being constructed and maintained within the subdivision. Voicestream and SWC respond that the use of the word "structure" in section 4 is intended to govern only the primary or principal buildings constructed on the lots, including a garage and any guest house, and to preclude construction of a commercial building as the primary structure. They further argue that section 4 was not intended to govern complementary or auxiliary structures such as a dog house, children's playhouse, garden or tool shed, radio tower, above-ground swimming pool, or a basketball hoop attached to a free-standing pole, and that the tower complements the church as a tree house might complement a residence. Alternatively, they assert that if the meaning of section 4 is unclear, its ambiguity requires interpretation in favor of the free use and enjoyment of property in the subdivision.

¶ 13 Words in a restrictive covenant must be given their ordinary meaning, and the use of the words within a restrictive covenant gives strong evidence of the intended meaning. *Duffy v. Sunburst Farms E. Mut. Water & Agric. Co.,* 124 Ariz. 413, 416, 604 P.2d 1124, 1127 (1979). Unambiguous restrictive covenants are generally enforced according to their terms. *Id.* at 417, 604 P.2d at 1128. Restrictions that are not absolutely clear should "be interpreted in the ordinary and popular sense, related to circumstances under which they were used, having in mind their purpose and general situation." *Riley v. Stoves,* 22 Ariz.App. 223,

226, 526 P.2d 747, 750 (1974). If the language of a restrictive covenant is judged to be ambiguous, it should be construed in favor of the free use of the land. *Duffy,* 124 Ariz. at 417, 604 P.2d at 1128.

¶ 14 A restrictive provision much like section 4 was considered by this court in *Horton v. Mitchell,* 200 Ariz. 523, 29 P.3d 870 (App. 2001). The restriction at issue in *Horton* stated:

No structure shall be erected, altered, placed or permitted to remain on any of said lots other than one detached single[-]family dwelling not to exceed two (2) stories in height, or tri-level single[-]family dwelling and a private garage not to exceed one (1) story in height for not more than three (3) cars.

*Id.* at 526, ¶ 12, 29 P.3d at 873. The *Horton* court considered whether this provision prevented the construction of a roadway across a subdivision lot governed by the restrictions. *Id.* at 525, ¶ 6, 29 P.3d at 872.

¶ 15 The court stated that the inquiry was whether the proposed roadway was the equivalent of a "structure." *Id.* at 527, ¶ 16, 29 P.3d at 874. It first determined that nothing in the restrictions revealed "an intent to limit the term 'structure' to anything other than its ordinary meaning." *Id.* at ¶ 17, 29 P.3d 870. As an example, the court noted that paragraph 2 of the restrictions stated that "[a]ll *structures* of said Lots shall be of new construction and no *building* shall be moved from any other location onto any of said lots." *Id.* (emphasis added). From this provision, the court concluded that buildings were not the only structures that were anticipated on the lots. *Id.* The *Horton* court also decided that another provision of the restrictions indicated that "structure" was meant to be given its ordinary meaning because it stated that "[n]o structure of any kind or nature shall be erected on the easements for public utilities shown on the said plat of [the subdivision]." *Id.*

¶ 16 In reaching its decision, the *Horton* court used the dictionary definition of a "structure" as "[s]omething constructed." *Id.* at ¶ 18, 29 P.3d 870 (quoting The American Heritage Dictionary of the English Lan-

guage 1782 (3d ed.1992)). "Clearly," stated the court, "a roadway is a structure—that is, 'something constructed'—within the ordinary meaning of the term and within the meaning of the Restrictions." *Id.* It thus held that the restrictions specifically precluded the construction or retention of any structure other than a single-family home. *Id.* at 528, ¶ 19, 29 P.3d at 875. According to the court, interpreting the term "structure" to exclude the proposed roadway "would render meaningless '[t]he sanctity of written contracts, [which] defin[e] the rights and duties of the contracting parties,' *Apolito v. Johnson,* 3 Ariz.App. 358, 360, 414 P.2d 442, 444 (1966), and would violate the clear intent of the Restrictions as a contract among the property owners." *Id.* (alterations in original).

¶ 17 The provisions of the Restrictions at issue here are sufficiently similar to those considered by the *Horton* court that *Horton's* analysis of the word "structure" also controls here. For example, the Desert Estates Restrictions also contain a section stating that "[a]ll structures on said lots shall be of new construction and no building shall be moved from any other location onto any of said lots." Thus, these Restrictions also indicate that buildings are not the only structures that might be placed on the subdivision lots. In addition, like the restrictions in *Horton,* these Restrictions include a provision that "[n]o structure of any kind shall be erected, permitted or maintained on the easements for utilities as shown on the plat of DESERT ESTATES UNIT 4." Regardless of this provision, a single-family dwelling ordinarily would not be built on a utility easement. Therefore, this provision logically refers to other types of structures.

¶ 18 Following *Horton,* we conclude that section 4 of the Restrictions is not ambiguous and that it clearly precludes the construction on each lot of any structure other than a single-family home, garage, and guest house (unless expressly authorized elsewhere in the Restrictions, as in the case of stables and corrals authorized under section 15). The tower is unquestionably a "structure" and it

is not a single-family home, garage, or guest house. Therefore, erecting and maintaining a fifty-foot tower on any lot in the subdivision is prohibited by the Restrictions.

¶ 19 Voicestream's and SWC's argument that such an interpretation would preclude complementary or auxiliary structures does not convince us otherwise. In construing restrictive covenants, the intention of the parties to the instrument is paramount. *Ariz. Biltmore Estates Ass'n v. Tezak,* 177 Ariz. 447, 449, 868 P.2d 1030, 1032 (App.1993). Such covenants "should not be read in such a way that defeats the plain and obvious meaning of the restriction." *Id.* The Desert Estates Restrictions provide that all of the lots in the subdivision "shall be known and described as residential lots," that "[a]ll deeds shall be given and accepted upon the express understanding that said subdivision has been carefully planned as a choice residential district exclusively," and that "under no pretext will there be an abandonment of the original plan to preserve said DESERT ESTATES UNIT 4 as a choice residential district." Section 4 of the Restrictions gives homeowners in the subdivision the ability to prevent structures on the lots that might compromise the aesthetics and general character of the neighborhood. Applying the provision as we interpret it furthers the goal of maintaining the subdivision as a "choice residential district." The fact that the homeowners may choose to allow complementary structures that do not negatively impact the character of the neighborhood does not defeat the meaning of section 4. Accordingly, we agree with the Burkes' contention that section 4 of the Restrictions unambiguously prohibits the tower.[2]

### Waiver

¶ 20 Voicestream and SWC argue that even if section 4 applies to prohibit the tower, the restrictions in section 4 have been waived or abandoned due to acquiescence by the homeowners in previous violations of the restrictions by SWC and other lot owners. They contend, for example, that one lot in

2. Because we conclude that section 4 prohibits the tower, we do not address whether section 13 of the Restrictions, which prohibits advertising signs, billboards, unsightly objects, or nuisances, also applies to the tower.

the subdivision contains a two-story barn converted into living quarters, another lot has a 30–foot flagpole,[3] and the three lots owned by SWC contain church buildings, two other bell towers, a flagpole, and a 38–foot cross. The Burkes respond that there has been no waiver based on these facts and further that the non-waiver provision of the Restrictions is enforceable. The non-waiver provision provides that "[f]ailure to enforce any of the restrictions, rights, reservations, limitations and covenants contained herein shall not in any event be construed or held to be a waiver thereof or consent to any further or succeeding breach or violation thereof."

¶ 21 In the absence of a non-waiver provision, particular deed restrictions will be considered abandoned and waived, and therefore unenforceable, if frequent violations of those restrictions have been permitted. *See Riley,* 22 Ariz.App. at 229–30, 526 P.2d at 753–54. We must decide whether the express non-waiver provision in these Restrictions precludes a finding of waiver. *See Adams v. Lindberg,* 125 Ariz. 441, 442, 610 P.2d 75, 76 (App.1980) (relying in part on the presence of a non-waiver clause in a restrictive covenant to find that the right to enforce a restriction was not waived despite other violations of the restrictions); *see also Simms v. Lakewood Vill. Prop. Owners Assoc., Inc.,* 895 S.W.2d 779, 786–87 (Tex.App. 1995) (using the presence of a non-waiver provision as a factor in finding that a restrictive covenant was not waived).

¶ 22 Even though Voicestream and SWC presented evidence that the homeowners in Desert Estates have acquiesced in prior violations of section 4, we have not been presented any persuasive reason why the non-waiver provision of the Restrictions should not be enforced in this instance. Unambiguous provisions in restrictive covenants will generally be enforced according to their terms. *See Duffy,* 124 Ariz. at 417, 604 P.2d at 1127; *Garden Lakes Cmty. Ass'n, Inc. v. Madigan,* 204 Ariz. 238, 241, ¶ 12, 62 P.3d 983, 986 (App.2003). These Restrictions were drafted to allow enforcement of restrictive covenants by individual homeowners. The non-waiver provision, by its plain language, is intended to prevent a waiver based on prior inaction in enforcing the Restrictions. To hold otherwise would render the non-waiver provision meaningless and violate the expressed intention of the contract among the property owners. *See Apolito v. Johnson,* 3 Ariz.App. at 360, 414 P.2d at 444 (commenting on the importance of upholding the "sanctity of written contracts, defining the rights and duties of the contracting parties . . .").

¶ 23 SWC and Voicestream contend that the non-waiver provision is so unreasonable that it should be declared invalid. They cite *Valley Medical Specialists v. Farber,* 194 Ariz. 363, 372, ¶ 30, 982 P.2d 1277, 1286 (1999), in which our supreme court said that "Arizona courts will 'blue pencil' restrictive covenants, eliminating grammatically severable, unreasonable provisions." According to Voicestream and SWC, application of the non-waiver provision would lead to "the entirely selective, random, arbitrary, capricious, and potentially discriminatory enforcement" of the Restrictions. We disagree with this conclusion for two reasons.

¶ 24 First, we are not persuaded that the "blue pencil" rule mentioned in *Valley Medical Specialists* has any application to restrictive covenants in deeds. The court in *Valley Medical Specialists* was addressing whether a restrictive covenant in an employment agreement would be enforced to prevent a doctor from competing with his former employer. Different considerations impact the enforceability of such non-compete provisions.

¶ 25 Second, we conclude that the non-waiver provision in the Restrictions is reasonable and that there is nothing arbitrary or capricious in homeowners seeking to prevent a fifty-foot tower—a prohibited "structure"—from being erected on a neighboring lot. The drafters of the Restrictions chose not to create a homeowners association. Without the non-waiver provision, the inaction of a homeowner on one side of the subdivision

---

**3.** In 2002, the Arizona legislature enacted Arizona Revised Statutes ("A.R.S.") section 33–1808 (Supp.2003), which provides in part that an association's rules "may regulate the location and size of flagpoles but shall not prohibit the installation of a flagpole."

could result in a waiver of the right of a homeowner on the other side of the subdivision to enforce the Restrictions in regard to an adjacent lot.

¶ 26 The non-waiver provision would be ineffective if a complete abandonment of the entire set of Restrictions has occurred. The test for determining a complete abandonment of deed restrictions—in contrast to waiver of a particular section of restrictions—was set forth by our supreme court in *Condos v. Home Development Company*, 77 Ariz. 129, 267 P.2d 1069 (1954): "[W]hether the restrictions imposed upon the use of lots in this subdivision have been so thoroughly disregarded as to result in such a change in the area as to destroy the effectiveness of the restrictions, defeat the purposes for which they were imposed and consequently [ ] amount to an abandonment thereof." *Id.* at 133, 267 P.2d at 1071.

¶ 27 No evidence was presented, however, that Desert Estates is no longer a "choice residential district." The violations of section 4 described by Voicestream and SWC have not destroyed the fundamental character of the neighborhood. We conclude, as a matter of law on the record before us, that the non-waiver provision of the Restrictions remains enforceable and the subdivision property owners have not waived or abandoned enforcement of section 4 even though they or their predecessors have acquiesced in several prior violations of its provisions.

### Balance of Harm

■ ¶ 28 The trial court concluded that removal of the tower would cost Voicestream approximately $300,000 and, therefore, the damages to Voicestream and SWC from enforcement of section 4 were disproportionate to the harm that the Burkes would suffer. In response, the Burkes contend that Voicestream and SWC are not entitled to claim hardship because they proceeded with the tower construction knowing of the Restrictions and that neighboring homeowners objected to the tower. We agree with the Burkes.

¶ 29 In *Camelback Del Este Homeowners Ass'n v. Warner*, 156 Ariz. 21, 26, 749 P.2d 930, 935 (1987), a developer who bought residential property with the intent to develop an office complex argued that enforcement of the restrictions that limited the property to residential use would cause him to suffer economic loss of between $350,000 and $400,000. The court rejected that argument, stating:

> It would indeed be inequitable to permit a party who is fully cognizant of building restrictions and the opposition of at least some homeowners to changes in those restrictions to expend large sums of money on the gamble that the restrictions would not be enforced against him and then claim that enforcement of the restrictions works a hardship on him.

*Id.; see also Condos*, 77 Ariz. at 136, 267 P.2d at 1073 (party selling liquor from property with knowledge of restrictive covenant prohibiting sale of liquor could not complain of any losses or hardships that may result from injunction enforcing covenant). Because they proceeded with construction knowing of the Restrictions and that several homeowners claimed that the tower was prohibited under the Restrictions, Voicestream and SWC cannot now avoid an injunction by claiming hardship.

### Alleged Delay by the Burkes

■ ¶ 30 The trial court also found that the Burkes were precluded from obtaining equitable relief because they knew of the proposed tower by late 1999, but by the time they filed their complaint and sought a temporary restraining order in June 2000, the construction was substantially completed. The Burkes respond that soon after they learned of the project, they wrote the letter dated November 5, 1999, notifying SWC that the tower would violate the Restrictions and that the neighbors opposed its installation, but Voicestream and SWC proceeded with construction anyway.

¶ 31 The Restrictions do not require the Burkes to seek injunctive relief prior to a violation of the Restrictions. Section 18 of the Restrictions authorizes a landowner to seek injunctive relief "[u]pon the breach of any of said covenants or restrictions." Although the Burkes objected to the tower in November 1999, the actual violation did not

occur until construction began on June 16, 2000, and the Burkes filed this action one week later.[4]

¶ 32 Additionally, once the Burkes notified SWC that the proposed tower would violate the Restrictions and that they opposed construction of the tower, we perceive no legal or equitable reason why the Burkes must also file suit to enjoin the construction before it has begun. *Cf. McComb v. Maricopa County Superior Court,* 189 Ariz. 518, 526, 943 P.2d 878, 886 (App.1997) (stating that plaintiff, to avoid laches, is not required to file a lawsuit "as the very first course of action").

¶ 33 Furthermore, nothing prevented Voicestream and SWC from filing a declaratory judgment action seeking a determination whether the proposed tower would violate the Restrictions. The risk of proceeding with construction of the tower without a judicial determination is more appropriately placed on Voicestream and SWC than on the Burkes. *Cf. McDonough v. W.W. Snow Const. Co., Inc.,* 131 Vt. 436, 306 A.2d 119, 122 (1973) ("Another principle to be considered in the enforcement of restrictive covenants is that by virtue of appearing in the deed the defendant knew or should have known of the restrictive covenant, and under such circumstances the defendant acted at its own peril without first obtaining a resolution of the covenant.").

¶ 34 We conclude, therefore, as a matter of law that the Burkes are not precluded from obtaining injunctive relief regarding the tower under these circumstances.[5]

### Amendment of Complaint

¶ 35 The Burkes had filed a motion to amend their complaint to add claims for intentional interference with contract and private nuisance and to add as plaintiffs another homeowner and the newly-organized homeowners' association for the subdivision. The trial court denied the motion, noting that its rulings on the motions for summary judg-

ment resolved the proposed claims. Because we have concluded that the Restrictions are enforceable, the court's reason for denying the motion is no longer valid. Therefore, we vacate the denial of the motion to amend and remand for further consideration by the trial court.

### Cross–Appeal

¶ 36 Voicestream and SWC cross-appeal to argue that the trial court abused its discretion in failing to award fees to them. In light of our disposition of this appeal, Voicestream and SWC are no longer the prevailing parties and, accordingly, are not entitled to an award of attorneys' fees.

### CONCLUSION

¶ 37 This court reviews a summary judgment to determine "whether a genuine issue of material fact exists and whether the trial court correctly applied the law." *PNL Asset Mgmt. Co. v. Brendgen & Taylor P'ship,* 193 Ariz. 126, 129, ¶ 10, 970 P.2d 958, 961 (App. 1998). We view the facts most strongly against the moving parties. *Id.* When cross-motions for summary judgment have been filed, this court may evaluate the cross-motions and, if appropriate, remand with instructions that judgment be entered in favor of the appellants. *Id.*

¶ 38 We reverse the summary judgment in favor of SWC and Voicestream, and remand for entry of summary judgment and injunctive relief in favor of the Burkes plus any further necessary proceedings consistent with this opinion. Section 4 of the Restrictions is applicable to the cellular tower and the Burkes are entitled to its enforcement.

¶ 39 The Burkes have requested an award of attorneys' fees incurred on appeal under Arizona Revised Statutes ("A.R.S.") section 12–341.01 (Supp.2003). In our discretion, we grant this request. *See Pinetop Lakes Ass'n v. Hatch,* 135 Ariz. 196, 198, 659 P.2d 1341, 1343 (App.1983) (holding that action to

---

4. The tower structure was substantially completed by June 27, 2000. *See supra* ¶ 7.

5. Delay by homeowners and the balancing of hardships will, in many instances, prevent injunctive relief to enforce deed restrictions. Our

opinion should not be understood as suggesting that the homeowners of this subdivision could force SWC to now remove its church buildings or structures other than this tower.

enforce deed restriction arose out of contract for purpose of fee award under § 12–341.01). After the Burkes have complied with Arizona Rule of Civil Appellate Procedure 21, we will determine the amount of the fees to be awarded.

CONCURRING: PHILIP HALL, Presiding Judge and LAWRENCE F. WINTHROP, Judge.