241 P.3d 897

COLLEGE BOOK CENTERS, INC., 401 Profit Sharing Plan and Trustee, a Trust dated October 14, 1994 with Trustee David B. Vanyo, Plaintiffs/Appellees,

v.

CAREFREE FOOTHILLS HOME-OWNERS' ASSOCIATION; John P. Dwyer, Jr., and Janet G. Dwyer, husband and wife, Defendants/Appellants.

No. 1 CA–CV 08–0450.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 26, 2010.

* Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Michael D. Ryan, Retired Justice of the Supreme Court of Arizona, was designated to sit on this matter.

Gallagher & Kennedy, P.A. By Jeffrey D. Gross, Phoenix, Attorneys for Plaintiffs/Appellees.

Meagher & Geer, P.L.L.P. By Thomas H. Crouch and Kevin T. Minchey, Scottsdale, Attorneys for Defendants/Appellants.

## OPINION

BROWN, Judge.

¶ 1 Defendant Carefree Foothills Homeowners' Association (the "HOA") appeals a jury verdict in favor of plaintiff David Vanyo, as trustee for College Book Centers, Inc., 401 Profit Sharing Plan ("Vanyo"). The HOA argues that the trial court erred in denying its motions for judgment as a matter of law ("JMOL") as to all three of Vanyo's claims: (1) whether the HOA waived a provision of the Declaration of Covenants, Conditions, and Restrictions ("CC&Rs") prohibiting non-residential structures; (2) whether Vanyo proved he acquired an implied way of necessity, and (3) whether Vanyo established

he could utilize Arizona's private way of necessity statute[1] to negate a provision of the CC&Rs prohibiting non-residential structures. For the following reasons, we reverse the court's denial of the HOA's motion for JMOL on Vanyo's waiver and implied way of necessity claims and remand for further proceedings on his claim for private condemnation.

## BACKGROUND

¶ 2 Carefree Foothills is a residential subdivision consisting of seventy-six lots. Each lot is subject to the CC&Rs, which include a provision prohibiting non-residential structures, and each lot owner is subject to mandatory membership in the HOA. An architectural control committee is responsible for approving the construction of any building or structure to be placed on the lots. The CC&Rs further provide that the failure to enforce any provision will not result in subsequent waiver or abandonment of the right to enforce such restriction in the future.

¶ 3 Lot 24 is undeveloped and is located on a cul-de-sac street. Adjacent to the eastern border of Lot 24 is a nine-acre rectangular parcel known as the Mamie Maude Mining Claim ("Mamie Maude"), which is not part of Carefree Foothills. Together with three other mining claims, Mamie Maude was originally transferred to private ownership in 1912 when the U.S. government granted a land patent. At the time of the conveyance, federal land surrounded the four mining claims. The mining claims at one point were allegedly accessible by Sentinel Rock Road, which is located just to the north of Mamie Maude in its current configuration.

¶ 4 A steep slope divides Mamie Maude into two areas: the elevated northern portion is sufficient for one large home site and the lower southern portion has adequate space to build four homes on one-acre lots. Because of the steep grade, it is not feasible to safely build a road connecting the two portions of Mamie Maude. Sentinel Rock Road currently provides access to a planned development

---

1. *See* Arizona Revised Statutes ("A.R.S.") section 12-1202(A) (2003) (owner of landlocked property may "condemn and take lands of another" for construction and maintenance of a private way of necessity).

north of Mamie Maude, but it does not provide legal access to Mamie Maude.

¶ 5 Vanyo's predecessors-in-interest submitted a plan to the HOA to build a roadway across Lot 24 to develop four lots on Mamie Maude's lower portion. The HOA rejected the request, explaining that allowing construction of a roadway would violate the restriction that prohibits non-residential structures.[2]

¶ 6 In March 2005, Vanyo purchased Lot 24 and Mamie Maude. He later asserted he was unaware of access problems at the time he agreed to buy the properties. He admitted, however, that during a five-month due diligence period before close of escrow, he became aware Lot 24 was subject to CC&Rs prohibiting a roadway and that developing Mamie Maude would be difficult. During that time period, the developer of a subdivision to the north of Mamie Maude advised Vanyo that he could potentially purchase an easement along Sentinel Rock Road to access Mamie Maude. Following close of escrow, Vanyo submitted a proposal to build a roadway across Lot 24, which the HOA rejected in November 2005.

¶ 7 In August 2006, Vanyo sued the HOA and Carefree Foothills lot owners as a class, naming the HOA as class representative.[3] In his complaint, he alleged generally that the HOA's denial of his request to construct a roadway across Lot 24 prevented him from accessing Mamie Maude. Vanyo sought a declaratory judgment: (1) that the HOA waived the restriction prohibiting non-residential structures by explicitly or implicitly approving two other roadways within the subdivision; and (2) that Vanyo was entitled to an implied way of necessity across Lot 24. Alternatively, Vanyo alleged he was entitled to obtain a statutory private way of necessity

across Lot 24. Specifically, he sought to obtain an easement across Lot 24 by condemning the lot owners' interest in the CC&R provision that prohibits non-residential structures. During the course of the litigation, both parties unsuccessfully moved for summary judgment.

¶ 8 All three claims were tried to a jury, which found in favor of Vanyo on his claim that the HOA waived its ability to enforce the CC&R provision. The jurors did not decide Vanyo's implied way of necessity and private condemnation claims because the special verdict form instructed them not to continue if they found in his favor on the waiver claim. The trial court later awarded $100,000 in attorneys' fees to Vanyo. The HOA then renewed its motions for JMOL on all three claims and alternatively requested a new trial based on the jury instruction on waiver. The court denied the motions and this timely appeal followed.

## DISCUSSION

¶ 9 We review de novo whether a trial court should have granted a motion for JMOL. *Aegis of Ariz., L.L.C. v. Town of Marana,* 206 Ariz. 557, 566, ¶ 34, 81 P.3d 1016, 1025 (App.2003). A court properly grants JMOL "only if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant." *Shoen v. Shoen,* 191 Ariz. 64, 65, 952 P.2d 302, 303 (App.1997). In making this determination, we view "the evidence in a light most favorable to upholding the jury verdict" and will affirm "if any substantial evidence exists permitting reasonable persons to reach such a result." *Hutcherson v. City of Phoenix,* 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998).

---

**2.** Article VI, Section 1 of the CC&Rs provides: "All of the Property shall be used, improved and devoted exclusively to single family residential use [.] No structure whatever, other than one private single family residence ... shall be erected, placed or permitted to remain on any lot." Vanyo does not dispute that the roadway he desires to build is a non-residential structure within the meaning of the CC&R's. *See Horton v. Mitchell,* 200 Ariz. 523, 527, ¶ 16, 29 P.3d 870, 874 (App.2001) (concluding that roadway is a

structure within the ordinary meaning of the word).

**3.** The owners of a different lot in the same cul-de-sac as Lot 24 opted out of the class and participated in the trial but they were later allowed to rejoin the class. For ease of reference, except where necessary to make a specific distinction, we refer to the lot owners and the homeowners' association collectively as the "HOA."

## I. Waiver

¶ 10 The HOA argues that the court erred in denying its motion for JMOL and allowing the jury to render a verdict on Vanyo's waiver claim. The HOA contends that it never approved similar CC&R violations, and even if it did, the non-waiver provision in the CC&Rs bars Vanyo's waiver claim.[4]

¶ 11 Restrictive covenants are a "contract between the subdivision's property owners as a whole and individual lot owners." *Ahwatukee Custom Estates Mgmt. Ass'n, Inc. v. Turner*, 196 Ariz. 631, 634, ¶ 5, 2 P.3d 1276, 1279 (App.2000). We interpret restrictive covenants in accordance with the Restatement (Third) of Property: Servitudes § 4.1(1) (2000), which gives effect to the intention of the parties as determined from the language, as well as the circumstances and purposes relating to its creation. *Powell v. Washburn*, 211 Ariz. 553, 556–57, ¶ 13, 125 P.3d 373, 376–77 (2006). The interpretation of a restrictive covenant is generally a matter of law, which we review de novo. *Id.* at 555–56, ¶ 8, 125 P.3d at 375–76.

¶ 12 As Vanyo does not dispute that his proposed roadway is a non-residential structure that would violate the CC&Rs, the HOA has the right to prevent the roadway. *See Whitaker v. Holmes*, 74 Ariz. 30, 32, 243 P.2d 462, 463 (1952) (noting that courts are bound to require compliance with restrictive covenants if they are not contrary to law and are unambiguous); *Continental Oil Co. v. Fennemore*, 38 Ariz. 277, 281, 299 P. 132, 133 (1931) (holding that when deed restrictions provide for the uses for which land may be used, the restrictions may be enforced in equity). However, in the absence of a non-waiver provision, a homeowners' association or an affected lot owner may waive the right to enforce particular restrictive covenants. *See Burke v. Voicestream Wireless Corp. II*, 207 Ariz. 393, 398, ¶ 21, 87 P.3d 81, 86 (App. 2004) (citing *Riley v. Stoves*, 22 Ariz.App. 223, 229–30, 526 P.2d 747, 753–54 (1974)) (noting that frequent violations may result in a waiver of ability to enforce a specific covenant). Thus, to establish waiver by the HOA, Vanyo was required to prove there were frequent violations of the CC&R provision prohibiting non-residential structures.

### A. Frequency of Violations

¶ 13 At trial, Vanyo presented evidence in support of his claim that two similar CC&R violations had occurred on lots located within Carefree Foothills. The first violation evolved from the 1984 grant of an access easement across Lot 7 to a five-acre parcel outside of the subdivision. A roadway (the "Thiele roadway") was later constructed on Lot 7 to allow access to the five-acre parcel, which like Mamie Maude, is currently zoned for one residence per acre. Nevertheless, only one home has been constructed on the parcel since Ralph Applegate, the developer of Carefree Foothills, granted the easement. At that time, Applegate unilaterally made all decisions regarding the subdivision because the HOA had not been formed.

¶ 14 The second violation arose from the 1987 grant of an easement for reciprocal ingress and egress among the then current owners of Lots 42 and 43, and Applegate, who owned Lot 44 at the time. A roadway (the "Applegate roadway") crossing all three lots, which are now under common ownership, was constructed for the purpose of providing access to the residence located on Lot 42, the only lot of the three that has been developed.[5]

---

4. In the alternative, the HOA asserts the court erroneously relied on two California cases, *Harrison v. Frye*, 148 Cal.App.2d 626, 307 P.2d 76 (1957), and *Johnstone v. Bettencourt*, 195 Cal. App.2d 538, 16 Cal.Rptr. 6 (Cal.Ct.App.1961), when it instructed the jury that "[a] party may waive the right to enforce a deed restriction or provision in CC&Rs by acquiescing to *a similar use* by other owners of land in subdivisions." (Emphasis added.) Consistent with our discussion of the legal requirements for establishing waiver in Arizona, *see infra* ¶¶ 12–15, we agree

that the jury instruction was improper. Because we conclude, however, that the trial court should have granted JMOL in favor of the HOA, we need not remand this matter for a new trial on waiver with a proper instruction.

5. The record is unclear as to when the two roadways were constructed, but it appears to be no later than 1987. Regardless, it is undisputed that the roadways have existed for approximately twenty years.

¶ 15 Assuming that both of these situations violate the non-residential structure restriction, we conclude as a matter of law that the Thiele and Applegate roadways do not constitute frequent violations such that a jury might reasonably infer waiver. *See, e.g., Sterling Cotton Mills, Inc. v. Vaughan,* 24 N.C.App. 696, 212 S.E.2d 199, 204 (1975) (finding four violations out of sixty-two lots in subdivision insufficient to constitute waiver); *Pebble Beach Prop. Owners' Assoc. v. Sherer,* 2 S.W.3d 283, 290–91 (Tex.Ct.App.1999) (holding as a matter of law that association did not waive its right to enforce restriction prohibiting mobile homes where there were fourteen similar violations in an 800 lot subdivision); *Tanglewood Homes Ass'n, Inc. v. Henke,* 728 S.W.2d 39, 43, 44 (Tex.Ct.App. 1987) (holding that five violations in fifty-six lot subdivision were insufficient as a matter of law "in number, nature, and severity" to bar enforcement based on waiver argument but upholding jury's determination that fifteen violations of setback requirements constituted waiver); *Raintree of Albemarle Homeowners Ass'n, Inc. v. Jones,* 243 Va. 155, 413 S.E.2d 340, 343 (1992) (finding· that two previous violations of similar nature were not sufficient to constitute waiver of deed restriction's future enforcement); *Keller v. Branton,* 667 P.2d 650, 654 (Wyo.1983) (relying on *Riley* in declining to find waiver of right to enforce restriction prohibiting front-yard fence where twenty out of 157 lots also had some type of front-yard fences). On this record, no reasonable jury could find that the Thiele and Applegate roadways, constructed in violation of the CC&Rs in the 1980s, were frequent violations of the CC&Rs in Carefree Foothills' seventy-six lot subdivision. *See* Webster's II New College Dictionary 456 (3rd ed.2005) (defining "frequent" as "[h]appening or appearing often or at close intervals"; "[h]abitual or regular").

## B. Non–Waiver Clauses

¶ 16 Even if the two violations could reasonably be considered frequent, we hold that the HOA was entitled to JMOL based on Article VII, Section 1(b) of the CC&Rs, which provides as follows: "The failure by an Owner to enforce any restrictions, conditions, covenants or agreements herein contained shall not be deemed a waiver or abandonment of this Declaration or any provision thereof." [6] The HOA's right of enforcement with regard to this non-waiver clause is governed by the express language of the clause. *See, e.g., Murphey v. Gray,* 84 Ariz. 299, 305, 327 P.2d 751, 755 (1958) (explaining that a purchaser of land who has notice of restrictions placed on the land by agreement is bound to follow the restrictions "because it would be unconscionable and inequitable for him to violate or disregard a valid agreement in regard to the estate of which he had notice when he became the purchaser"); *see also Burke,* 207 Ariz. at 398, ¶ 22, 87 P.3d at 86 (noting that unambiguous covenants are generally enforced according to their terms).

¶ 17 In *Burke,* defendant Voicestream constructed a fifty-foot cellular phone transmission tower on church property, intending to disguise it as a bell tower. 207 Ariz. at 395, ¶¶ 4–5, 87 P.3d at 82–83. Adjacent lot owners sued Voicestream and the church to compel removal of the cell tower, asserting that a CC&R provision restricting non-residential structures prohibited the tower's construction. *Id.* at 396, ¶ 12, 87 P.3d at 84. Because there were several other violations of the non-residential structure restriction, Voicestream argued the restriction had been waived. *Id.* at 397–98, ¶ 20, 87 P.3d at 85–86. The adjacent lot owners countered that these examples did not constitute a waiver and, in any event, the non-waiver provision in the CC&Rs precluded such a claim. *Id.* The trial court found that the restriction had been waived on numerous occasions and therefore refused to enforce the non-waiver provision, deciding it could not be selectively enforced. *Id.* at 395, ¶ 8, 87 P.3d at 83.

¶ 18 On appeal, we recognized at the outset that absent a non-waiver provi-

---

**6.** The CC&Rs further state that the HOA has "all the rights and privileges of an Owner" relating to enforcement of the CC&Rs. Vanyo has not asserted that the HOA stands in a different position than the lot owners. Nor would such an argument be persuasive here because under the plain language of the CC&Rs, the HOA can rely on the non-waiver clause to the same extent as an "owner."

sion, deed restrictions may be considered abandoned or waived "if frequent violations of those restrictions have been permitted." *Id.* at 398, ¶ 21, 87 P.3d at 86. But when CC&Rs contain a non-waiver provision, a restriction remains enforceable, despite prior violations, so long as the violations did not constitute a "complete abandonment" of the CC&Rs. *Id.* at 399, ¶ 26, 87 P.3d at 87. Complete abandonment of deed restrictions occurs when "the restrictions imposed upon the use of lots in [a] subdivision have been so thoroughly disregarded as to result in such a change in the area as to destroy the effectiveness of the restrictions [and] defeat the purposes for which they were imposed[.]" *Id.* (quoting *Condos v. Home Dev. Co.*, 77 Ariz. 129, 133, 267 P.2d 1069, 1071 (1954)).

¶ 19 Here, Vanyo does not argue that the CC&Rs in Carefree Foothills have been disregarded so thoroughly as to constitute complete abandonment. Instead, he attempts to distinguish *Burke* on several grounds, which we address in turn.

¶ 20 Vanyo argues that the non-waiver provision in this case, like the non-waiver provision in *Burke*,[7] was intended only to protect the HOA from unintentionally waiving its enforcement rights through inaction and it was never intended to shield the HOA from the consequences of affirmatively approving CC&R violations.[8] We disagree.

¶ 21 First, the record does not support Vanyo's assertion that the HOA affirmatively approved the Thiele and Applegate roadways. Vanyo has not provided any board or committee minutes showing that the HOA approved or ratified either roadway. Thus, the most Vanyo can reasonably claim is that the HOA ignored the existence of the two roadways after they were constructed. Moreover, Vanyo does not direct us to any evidence in the record showing that the sev-

enty-five lot owners affirmatively approved construction of the roadways. As such, the lot owners fit squarely within the application of the non-waiver clause because they failed to enforce the CC&Rs. Additionally, Article 4, Section 14 of the CC&Rs provides that approval by the architectural control committee "shall not be deemed to constitute a waiver of any right to withhold approval of any similar plan, drawing, or specification or matter subsequently submitted for approval." Based on the plain language of this additional non-waiver clause, even if the HOA affirmatively approved the plans for the two roadways through its architectural control committee, the HOA would not necessarily be prevented from withholding approval of similar plans.

¶ 22 Second, assuming arguendo that the HOA in fact approved the two roadways, the law does not support Vanyo's assertion that waiver applies only in the context of affirmative acts. Waiver is the intentional relinquishment of a known right. *See Am. Cont'l Life Insur. Co. v. Ranier Const. Co., Inc.*, 125 Ariz. 53, 55, 607 P.2d 372, 374 (1980). In the absence of an express waiver, the intent to relinquish a right may be implied from the circumstances. *Id.* In the context of this case, we do not find a meaningful distinction between action and inaction. *See Sw. Cotton Co. v. Valley Bank*, 26 Ariz. 559, 563, 227 P. 986, 988 (1924) ("A waiver occurs when one in possession of any right ... *does* or *forbears* the doing of some things inconsistent with the existence of the right or his intention to rely upon it") (emphasis added and internal quotation marks omitted.) Nor have we recognized such a distinction previously, at least in the context of enforcement of restrictive covenants. *See, e.g., Donahoe v. Marston*, 26 Ariz.App. 187, 191, 547 P.2d 39, 43 (1976) (noting that defendants did not waive or

---

7. The non-waiver provision in *Burke* provided that "[f]ailure to enforce any of the restrictions, rights, reservations, limitations, and covenants contained herein shall not in any event be construed or held to be a waiver thereof or consent to any further or succeeding breach or violation thereof." 207 Ariz. at 396, ¶ 12, 87 P.3d at 84.

8. Vanyo's argument relies on this court's observation in *Burke* that "[t]he non-waiver provision,

by its plain language, is intended to prevent a waiver *based on prior inaction* in enforcing [CC&Rs]." 207 Ariz. at 398, ¶ 22, 87 P.3d at 86 (emphasis added). From our reading of *Burke*, the court's statement was based on the facts of that case and was not intended to distinguish failures of enforcement based on action versus inaction.

abandon restrictions in CC&Rs either by "*condoning or committing* the violations cited") (emphasis added). Here, the HOA's intent to waive a CC&R provision could be inferred from either its action or inaction; in either event, the HOA would fail to enforce the CC&R provision, falling within the plain language of the non-waiver clause. Thus, we reject Vanyo's attempt to distinguish *Burke* on the grounds of action versus inaction.

¶ 23 Vanyo also attempts to distinguish *Burke* on the basis that Voicestream never contended the subdivision contained other violations that were similar in nature to a cell tower, whereas Vanyo's proposed access road is identical, or at least substantially similar, to the Thiele and Applegate roadways. Nothing in *Burke,* however, suggests that Voicestream raised any argument that the deed restriction violations were so prevalent that all of the restrictions had been abandoned. 207 Ariz. at 397–98, ¶ 20, 87 P.3d at 85–86. Instead, Voicestream's waiver defense was based on the theory that other lot owners had violated the restriction prohibiting non-residential structures. *Id.* Although no other cell towers had been erected, the tower was designed to be disguised as a bell tower. *Id.* at 395, ¶ 4, 87 P.3d at 82. The church already had two other bell towers on its property, which together with other nonconforming lots, were tied to violations of the deed restriction prohibiting structures other than a single-family detached dwelling; thus, the distinction Vanyo seeks to draw is not persuasive. *See id.* at 399, ¶ 27, 87 P.3d at 87.

¶ 24 Vanyo further points to *Burke's* reliance on the subdivision's lack of a homeowners' association in deciding to enforce the non-waiver provision. *Id.* at 398, ¶ 25, 87 P.3d at 86. In *Burke,* we commented that inaction of lot owners on one side of the subdivision could result in a waiver of the lot owners on the other side of the subdivision to enforce a restrictive covenant provision on an adjacent property. *Id.* at 398–99, ¶ 25, 87 P.3d at 86–87. That scenario exists here as well—accepting Vanyo's view of the scope of the non-waiver clause could result in a finding of waiver based on the inaction of lot

owners who live farthest from the two roadways. Furthermore, in *Burke* we referenced the absence of an association in the context of explaining the reasonableness of the non-waiver clause and that there was nothing arbitrary or capricious about homeowners seeking to prevent construction of a fifty-foot tower. *Id.* Thus, although the lack of a homeowners' association was relevant to our discussion, it was only one of several factors we considered in determining that the non-waiver clause was enforceable.

¶ 25 Additionally, *Burke* was decided prior to *Powell,* where our supreme court clarified that ambiguities in restrictive covenants are not to be decided in favor of free use and enjoyment of property, but rather, in accordance with the contractual intent of the parties as inferred from the language and circumstances surrounding creation of the CC&R provision. *Powell,* 211 Ariz. at 556, ¶ 12, 125 P.3d at 376. In doing so, the supreme court noted the "contemporary judicial trend of recognizing the benefits of restrictive covenants." *Id.* at ¶ 16, 125 P.3d at 377. In light of *Powell,* to the extent we relied on the absence of a homeowners' association in *Burke,* that factor is no longer relevant as long as a non-waiver clause is unambiguous and thus enforceable according to its terms. *See Burke,* 207 Ariz. at 398, ¶ 22, 87 P.3d at 86 (concluding that a non-waiver clause should be upheld based on its plain language and that to hold otherwise would render the clause meaningless, in addition to violating the intention of the contract among the property owners).

¶ 26 Vanyo nonetheless contends that *Burke* should be limited to cases involving inaction because extending *Burke* to cases involving affirmative approval of CC&R violations would allow homeowners' associations to engage in institutionalized discrimination. Under the blanket protection afforded by non-waiver provisions, Vanyo suggests that associations could approve a CC&R violation one day, deny the same request to another homeowner the very next day, and then seek refuge under the shield of a non-waiver provision. In *Burke,* Voicestream raised the same contention, asserting that application of the non-waiver provision

would lead to "the entirely selective, random, arbitrary, capricious, and potentially discriminatory enforcement" of the deed restrictions. 207 Ariz. at 398, ¶ 23, 87 P.3d at 86 (internal quotation omitted). We rejected the argument, finding that the restriction prohibiting Voicestream's cell tower was reasonable. *Id.* at ¶ 25, 87 P.3d 81. Similarly, we agree that applying a plainly worded non-waiver clause will not encourage discriminatory conduct by homeowners' associations because they are constrained by principles of fairness and reasonableness. In *Tierra Ranchos Homeowners Ass'n v. Kitchukov*, we adopted the Restatement (Third) of Property: Servitudes § 6.13, which includes the duty of an association to "treat members fairly" and to "act reasonably in the exercise of its discretionary powers including rulemaking, enforcement, and design-control powers." 216 Ariz. 195, 201, ¶ 25, 165 P.3d 173, 179 (App.2007). Additionally, the failure of an association to take appropriate action to enforce restrictive covenants may subject it to liability. *See, e.g., Johnson v. Pointe Cmty. Ass'n, Inc.*, 205 Ariz. 485, 489, ¶ 22, 73 P.3d 616, 620 (App. 2003) (holding that an association's interpretation of its own restrictive covenants in a dispute with a homeowner is not entitled to judicial deference; reversing trial court's dismissal of claim for breach of fiduciary duty). In our view, these considerations will discourage an HOA from engaging in selective enforcement of restrictive covenants.

¶ 27 In sum, Vanyo's claim that the HOA waived its ability to enforce the CC&Rs to prevent construction of his proposed roadway across Lot 24 fails as a matter of law. We therefore vacate the jury's verdict and remand for entry of judgment in favor of the HOA on that claim.

## II. Implied Way of Necessity

¶ 28 The HOA argues that Vanyo failed to establish a prima facie case of an implied way

of necessity under the common law. Accordingly, the HOA asserts that the court erred in denying JMOL on this claim. We agree.

¶ 29 "[W]here land is sold that has no outlet, the vendor by implication of the law grants ingress and egress over the parcel to which he retains ownership, enabling the purchaser to have access to his property." *Bickel v. Hansen*, 169 Ariz. 371, 374, 819 P.2d 957, 960 (App.1991). In contrast to access achieved by private condemnation by statute, which is known as a "private way of necessity," an outlet imposed by common law implication is known as an "implied way of necessity." *Tobias v. Dailey*, 196 Ariz. 418, 421, ¶ 9, 998 P.2d 1091, 1094 (App.2000). An implied way of necessity is appurtenant to the land; thus, if the owner of Mamie Maude acquired an implied way of necessity over the adjoining federal land at the time Mamie Maude was created, Vanyo would enjoy that implied way of necessity today. *See id.* Otherwise, Vanyo could seek to obtain a private way of necessity under Arizona's private condemnation statute, A.R.S. § 12–1202(A) (2003).

¶ 30 To establish the existence of an implied way of necessity, Vanyo was required to prove that: (1) Mamie Maude (the dominant property) and the surrounding federal land (the servient property) were under common ownership; (2) Mamie Maude was severed; (3) Mamie Maude had no outlet at that time; and (4) access across federal land was reasonably necessary when severance occurred. *See Bickel*, 169 Ariz. at 374, 819 P.2d at 960 (implied way of necessity is dependent on (1) unity of ownership of the dominant and servient estates; (2) severance thereof; (3) no outlet for the dominant property; and (4) showing that reasonable necessity for access existed at the time of severance).[9]

¶ 31 It is undisputed that Mamie Maude and the surrounding federal lands were under common ownership prior to the sever-

---

**9.** In *Siemsen, Tobias*, and *Bickel*, the only three reported decisions in Arizona addressing this issue, none of the plaintiffs were seeking implied ways of necessity. *Siemsen v. Davis*, 196 Ariz. 411, 998 P.2d 1084 (App.2000); *Tobias*, 196 Ariz. at 420, 998 P.2d at 1092; *Bickel*, 169 Ariz. at 373, 819 P.2d at 959. Instead, they sought to obtain private ways of necessity. As such, they

were required to prove the absence of any other reasonable access, including that no implied way of necessity existed. Here, Vanyo alleged in his complaint that he was entitled to an implied way of necessity; therefore, in our view he has the burden of satisfying all of the elements of that claim.

ance of the four mining claims in 1912. However, we find nothing in the record establishing that Mamie Maude was landlocked in 1912 when severance occurred. Vanyo's evidence at trial, as well as his arguments on appeal, hinge on his contention that the 1912 patent transferring Mamie Maude and the other mining claims from the federal government into private ownership is sufficient to create an implied way of necessity because the patent was silent as to access. Vanyo asserts that because there has never been any "recorded" access to Mamie Maude, the only logical conclusion is that there has never been any "legal" access, thus proving the elements of an implied way of necessity.

¶ 32 We do not agree with Vanyo that the 1912 land patent's silence regarding access is sufficient to establish lack of an outlet at that time. As noted, Mamie Maude was conveyed as part of a larger parcel of real property.[10] Thus, Vanyo was required to provide at least some evidence showing that the property, consisting of the four mining claims, was landlocked. Vanyo did not, however, present any historical evidence at trial other than a 1909 survey and the 1912 land patent. He did not attempt to prove whether mining activities were being conducted at the time or whether access was necessary to perform such activities, which may have been by foot, mule, or wagon. That type of information would have provided the trier of fact with some basis to determine whether there was access to Mamie Maude or any of the adjoining mining claims that were conveyed in 1912. Having failed to present such evidence at trial, he cannot prevail on his claim for an implied way of necessity.[11]

10. The 1909 survey indicates that the northern mining area had four adjoining mining claims: (1) Henry W. Grady (Mar. 27, 1890); (2) Mormon Girl (Jan. 1, 1888); (3) Mormon Mine No. 2 (Feb. 17, 1890); and (4) Mamie Maude Mine (Mar. 18, 1890). All four mining claims were conveyed to Charles W. Cheney and F.H. Summeril by the 1912 land patent.

11. Vanyo has made no argument that he is entitled to an implied way of necessity based upon the subsequent severance of Mamie Maude from

¶ 33 Furthermore, although not raised by the HOA, we cannot ignore the fact that the 1909 survey depicts three roads crossing the center portion of the four mining claims, including one with the notation "Road to Cave Creek" that begins next to a small rectangle labeled "stable and blacksmith shop." Moreover, although the parties dispute whether Sentinel Rock Road has ever served Mamie Maude, the HOA presented evidence that Sentinel Rock Road had been used historically to access at least some portions of the other mining claims. The HOA did not prove when such access began or how long it continued; however, it was not the HOA's burden to do so. Instead, Vanyo had the burden of proving the lack of an outlet in 1912.

¶ 34 Vanyo argues that due to the policy behind the implied way of necessity doctrine, which is to encourage the use of land, our analysis must focus on "reasonable necessity, not historic use." He asserts that "any grant of rural property without express access that occurred prior to advent of the automobile and expansion of the roadway system could never give rise to an implied easement" and that "landlocked parcels" in Arizona could remain that way forever. Vanyo's contentions fail to consider that the Arizona Constitution provides a remedy for these circumstances—a private way of necessity. See Ariz. Const. art. 2, § 17. Thus, a landowner that cannot establish a right of access by implication, prescription, or otherwise, may nonetheless be able to obtain access.

¶ 35 Because we find no evidence in the record that Mamie Maude was inaccessible in 1912, we conclude that Vanyo failed to establish his entitlement to an implied way of necessity for Lot 24. Accordingly, the HOA is entitled to JMOL on Vanyo's claim.[12]

the larger parcel containing the other three mining claims.

12. Based on our conclusion, we need not discuss the parties' apparent assumption that Arizona law permits an owner of land (Vanyo) to properly claim a private way of necessity on adjacent land he already owns (Lot 24) in fee simple. Additionally, we need not address Vanyo's argument that even if the upper portion of Mamie Maude has access through Sentinel Rock Road, the steep slope separates Mamie Maude into two

## III. Statutory Condemnation

¶ 36 Finally, the HOA argues it was entitled to JMOL on Vanyo's claim that he has the statutory right to privately condemn the provision of the CC&Rs prohibiting non-residential structures, thereby removing the legal obstacle preventing construction of a roadway across Lot 24. We disagree.

¶ 37 Arizona law authorizes the owner of landlocked property to acquire a private way of necessity through condemnation:

> An owner of or a person entitled to the beneficial use of land, mines or mining claims and structures thereon, which is so situated with respect to the land of another that it is necessary for its proper use and enjoyment to have and maintain a private way of necessity over, across, through, and on the premises, may condemn and take lands of another, sufficient in area for the construction and maintenance of the private way of necessity.

A.R.S. § 12–1202(A); *see also* Ariz. Const. art. 2, § 17 (providing right to condemn private way of necessity, upon payment of just compensation, as an exception to the prohibition of taking private property for a private use).

 ¶ 38 This statutory right of condemnation "comes into existence only if no other access exists by common law implication." *Bickel*, 169 Ariz. at 375, 819 P.2d at 961. The mere fact an alternative route is available does not, however, bar a lawsuit seeking to condemn a private way of necessity. *Tobias*, 196 Ariz. at 421–22, ¶ 14, 998 P.2d at 1094–95. A person seeking to take a property interest of another must establish that a "reasonable necessity" exists. *See Solana Land Co. v. Murphey*, 69 Ariz. 117, 125, 210 P.2d 593, 598 (1949); *Siemsen*, 196 Ariz. at 414, ¶ 9, 998 P.2d at 1087.

¶ 39 We first note that Vanyo's attempt to acquire a property interest through private condemnation is unusual in that he does not seek a right-of-way or easement across Lot 24; instead, his intent is to remove the restriction in the CC&Rs that prohibits non-residential structures from being constructed on Lot 24. At trial, the court explained to the jury that Vanyo was seeking to condemn an "interest" in the CC&Rs that would otherwise prohibit him from using Lot 24 for access to Mamie Maude. The court also instructed the jury that "CC&Rs are a property right that may be condemned" and the HOA is "entitled to just compensation for the acquisition of the interest in the CC&Rs prohibiting the use of Lot 24 for access to adjoining property." The HOA did not object to the court's instructions nor does the HOA contend on appeal that private condemnation of a restrictive covenant is not authorized under Arizona law. As such, we assume without deciding that Vanyo may properly seek to condemn a provision of the CC&Rs. *See Lakemoor Cmty. Club, Inc. v. Swanson*, 24 Wash.App. 10, 600 P.2d 1022, 1027 (1979) (declining to address whether a Washington statute governing private ways of necessity permits condemnation of the "incorporeal covenant rights" of other landowners).

 ¶ 40 As discussed, *supra* ¶ 35, Vanyo was unable to establish his right to an implied way of necessity. Thus, to obtain the right to construct a roadway on Lot 24 based on a private right of condemnation he was merely required to demonstrate that removal of the non-residential structure restriction was reasonably necessary for the proper use and enjoyment of Mamie Maude. The evidence presented at trial was disputed as to whether Sentinel Rock Road provides reasonable access to Mamie Maude, including the larger portion located below the steep slope.[13] Thus, the issue of Vanyo's entitlement to condemn a property interest enabling him to access all or portions of Mamie Maude were questions for the jury and the trial court did not err in denying the HOA's motion for JMOL.

parcels that permit him to obtain an implied way of necessity on the upper portion.

13. Another potential fact issue is whether Vanyo's awareness of lack of access when he purchased Mamie Maude would defeat his ability to obtain a private way of necessity. *See Siemsen*,

196 Ariz. at 417, ¶ 26, 998 P.2d at 1090 (noting that landlocked owner's awareness of difficulty of access at time of purchase may be relevant when considering the adequacy of a less convenient alternative).

**544**

¶ 41 Because the jury found that the HOA waived its right to enforce the CC&Rs, it did not reach a verdict as to whether Vanyo could condemn the lot owners' interests in the CC&Rs. Nor did the jury determine whether the lot owners presented sufficient evidence to establish that they were entitled to damages for the loss of their ability to enforce the restrictive covenant against Lot 24. Accordingly, Vanyo is entitled to a new trial on his claim for private condemnation.

### IV. Attorneys' Fees

¶ 42 Because the trial court should have granted JMOL to the HOA on Vanyo's waiver claim, we vacate the court's award of attorneys' fees to Vanyo. In our discretion, we award the HOA its reasonable fees and costs incurred on appeal in addressing the waiver issue, upon the HOA's compliance with Arizona Rule of Civil Procedure 21. *See* A.R.S. § 12–341.01(A) (2003); *Pinetop Lakes Ass'n v. Hatch,* 135 Ariz. 196, 198, 659 P.2d 1341, 1343, (App.1983) (awarding attorneys' fees in an action to enforce deed restrictions because they arise out of contract). As to fees incurred by the HOA in the trial court relating to Vanyo's waiver claim, on remand the court may, in its discretion, award such fees. *See G & S Invs. v. Belman,* 145 Ariz. 258, 268–69, 700 P.2d 1358, 1368–69 (App. 1984).

### CONCLUSION

¶ 43 For the foregoing reasons, we hold that the trial court erred in denying the HOA's motion for JMOL on Vanyo's waiver and implied way of necessity claims. We remand for entry of judgment in favor of the HOA on those two claims. As to Vanyo's claim for acquiring access by virtue of a private right of condemnation, we remand for a new trial.

CONCURRING: PATRICIA A. OROZCO, Presiding Judge and PATRICIA K. NORRIS, Judge.